IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2006

## EDWARD R. FORESTER v. STATE OF TENNESSEE

**Direct Appeal from the Monroe County Criminal Court**
**No.04-041     Carroll L. Ross, Judge**

---

**No. E2005-01922-CCA-R3-PC - Filed September 21, 2006**

---

The Petitioner, Edward R. Forester[1], was convicted of aggravated burglary and received a sentence of eleven years in the Department of Correction.  This Court affirmed the conviction and sentence, and the Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing.  The Petitioner now appeals, contending that he received the ineffective assistance of counsel at trial.  Specifically, the Petitioner claims that his trial counsel was ineffective by: (1) failing to call two witnesses; and (2) failing to request a jury instruction on the lesser-included offense of criminal trespass.  Finding no reversible error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., joined.  JAMES CURWOOD WITT, JR., J., not participating.

J. Reed Dixon, Sweetwater, Tennessee, for the appellant, Edward Forester.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Jon Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Facts on Direct Appeal**

---

[1] We note that the technical record indicates that the Petitioner's last name is spelled Forrester and the transcript of the evidence lists his name as Forester.  The Forester spelling is also used in our opinion on direct appeal, and the Petitioner signed his petition for post-conviction relief spelling his name Forester, so we will use that spelling.

As set forth in our Court's opinion on direct appeal, the proof at the Petitioner's trial established the following facts:

Regina Hensley testified that, on the morning of November 4, 1999, she went to her parents' house to give her disabled mother a bath. Her father, Sam Raper, looked out the back door and noticed that a red truck was parked at Ms. Hensley's house, which was separated from her parents' house by only a field. When Ms. Hensley arrived in her driveway, she saw a man inside her house looking out the front door. Ms. Hensley went into her house and saw the intruder going around her kitchen table and out the back door. From her front porch, Ms. Hensley watched the man get into his truck. Although the man attempted to hide his face with his blue jean jacket, Ms. Hensley testified that she got a good look at his face. As he got into his truck, she saw him lay a gun, which he had taken from her house, in the seat of his pickup. As the man drove away, Ms. Hensley noticed his license plate number.

Ms. Hensley then went inside her house and called 911. She tried to remember the license plate number that she had seen, but she could not "because [she] was so shook up." However, she did give them what she thought to be the license number. Ms. Hensley discovered that a jar of money and old coins, which she and her husband kept in the top of the hall closet, was laying on the couch, empty. She also verified that the intruder had taken a gun from her bedroom closet.

Ms. Hensley described the truck the man was driving as small, old, and red with white pinstripes on each side. Detective Kenny Hope went to Ms. Hensley's house in order for her to view a photographic lineup. She was unable to identify the intruder from the first lineup, although the Defendant's picture was in that array. She did pick the Defendant's photograph out of a second lineup, shown to her at a later time. At trial, Ms. Hensley identified the Defendant in open court as the person she saw leaving her house on the day in question.

Detective Kenny Hope testified that he went to Ms. Hensley's house to investigate the burglary. He was able to lift a latent fingerprint from the jar that contained Ms. Hensley's money. He also interviewed Ms. Hensley. The license tag number she have him was 468SJP. However, the truck to which that license tag was registered did not fit the description of the vehicle given by Ms. Hensley. Some time later, Detective Hope received information regarding the vehicle used in the burglary. As a result of this information, the detective located the bed of a small Toyota truck that matched the description of the truck Ms. Hensley gave. Upon viewing a photograph of the truck bed, Ms. Hensley confirmed that it had come from the truck that was used in the burglary of her house. The truck bed was found at the Defendant's residence. At this point in Detective Hope's investigation, the Defendant became the prime suspect.

Eventually, a police officer saw the Defendant driving the cab and chassis of the Toyota truck and performed a traffic stop. Detective Hope testified that the truck cab had been painted black, but the red paint and pinstripes were still visible. The license plate number on the truck the Defendant was driving was 438SJP. The Defendant was placed under arrest and fingerprinted, and his photograph was inserted in a photographic lineup. Although Ms. Hensley had already viewed a lineup which contained a photo of the Defendant and was unable to identify him, Detective Hope allowed her to view a second array of photos that contained a more recent depiction of the Defendant. From this second lineup, Ms. Hensley identified the Defendant as the man she saw at her house.

On cross-examination, Detective Hope testified that he submitted the fingerprint found on the victim's money jar to Monica Datz with the sheriff's office for analysis. He admitted that, prior to Ms. Datz examining the print, he had the fingerprint analyzed by an expert in Loudon County, who stated that he was not able to conduct an identification or comparison because of the poor quality of the fingerprint. However, Detective Hope also testified that the examiner from Loudon County spent only two or three minutes looking at the print before he declared that he was unable to use it for comparison purposes.

Monica Datz, the fingerprint examiner for the Monroe County Sheriff's office, testified that she analyzed the fingerprint given to her by Detective Hope, which was lifted from the jar in which Ms. Hensley kept her money. Ms. Datz compared this print to the Defendant's fingerprints, and she concluded that the two fingerprints matched.

Leon Freeman, the Defendant's brother-in-law, testified for the defense. He testified that around September 23, 1999, he bought from the Defendant the truck bed that had been attached to the Defendant's Toyota truck. He further testified that the truck was not running on November 4, 1999, the date of the burglary, because the Defendant and he were changing the engine of the vehicle. He stated that they finished with the engine work "right around then, the 4th, 5th, somewheres [sic] along in there." However, they were unable to complete the wiring on the vehicle. Although Mr. Freeman testified that the Defendant's truck could not have been used in the burglary because it was not yet running, he acknowledged that he did not divulge that information to the police until a court proceeding in October of 2001.

Dennis Winkler also testified on the Defendant's behalf. He stated that the Defendant contacted him on November 2, 1999, about wiring his Toyota truck. He said that, at that time, the truck was not fitted with a distributor cap, without which it would not run. Mr. Winkler went to look at the truck on November 3; however, he did not perform the wiring work on the truck because he left on a hunting trip later that day.

Donnie McDaniel, the Defendant's uncle by marriage, testified that he wired the engine of the Defendant's pickup truck on November 5, 1999. He further testified that there was no way the truck could have run before he performed the wiring work. He said that he remembered wiring the truck on the fifth because he received his disability check on the third and paid his bills on the fourth. On cross-examination, Mr. McDaniel admitted that he never told the police that the Defendant's truck was not running on November 4.

The Defendant's father, Verlin Forester, also testified that the Defendant's truck was not operable on November 4, 1999, because it was not properly wired. Mr. Forester testified that he took the Defendant to work at 7:00 a.m. on the fourth of November. Mr. Forester stayed with the Defendant until approximately 10:00 or 10:30 in the morning, at which time he left. When he returned between 2:00 and 2:30, the Defendant was still there working. Mr. Forester testified that the Defendant's truck was repaired and running on either the fifth or sixth of November. Mr. Forester admitted that he did not make Detective Hope aware that his son was working on November fourth and that his truck was not running on that date. By way of explanation, Mr. Forester stated, "I just didn't figure that he'd believe me, so there wasn't no use in me talking to him about it, you know."

On cross examination, the prosecutor asked Mr. Forester why November 4 stood out in his mind. Mr. Forester responded that he always went deer hunting when muzzle-loader season opens. He went hunting on November 3, and the next morning, he took the Defendant to work. When the prosecutor confronted Mr. Forester with a copy of the 1999-2000 Tennessee Hunting and Trapping Season Guide, which listed November 8 as the date on which muzzle-loader season opened, Mr. Forester stated that he must have been poaching because he knew that he had been hunting on November 3, 1999.

Jeff Moses, whose wife was the Defendant's first cousin, testified that the Defendant worked on his property trimming trees on November 4. Mr. Moses testified that the Defendant and his father, Mr. Forester, arrived at about 7:00 a.m. in a red and white Chevrolet pickup. Shortly thereafter, Mr. Moses left for work. When Mr. Moses returned at about 2:00 or 2:30 in the afternoon, the Defendant was performing the requested work. For his labor, Mr. Moses paid the Defendant with a check, which was dated November 4, 1999, and this check was introduced as an exhibit. On cross examination, Mr. Moses admitted that he had not informed the police that the Defendant was on his property trimming trees on November 4, 1999.

State v. Edward R. Forester, No. E2003-00408-CCA-R3-CD, 2003 WL 22438501, at *1-3 (Tenn. Crim. App., at Knoxville, Oct. 28, 2003) (footnote omitted), *perm. app. denied* (Tenn. Mar. 8, 2004).

## B. Post-Conviction Facts

At the hearing on the Petitioner's petition for post-conviction relief, the following evidence was presented: The Petitioner testified that his trial occurred on August 22, 2002. He testified that, earlier, he was tried in the same court on the same charge, and that trial resulted in a hung jury. He said that, during the first trial, no one testified about a jar, and no fingerprint evidence was entered into evidence. The Defendant explained how his fingerprints got on the jar, stating that, on November 19, 1999, a police officer said that a lady saw the Petitioner load a motorcycle onto his truck, so the officer arrested him, and took him to jail. When the Petitioner was taken to jail and charged with stealing a motorcycle, the police asked him about several burglaries. The Sheriff asked the Petitioner to pick up, and look at, a jar in order to determine whether the Petitioner had seen the jar earlier. Then, before he was released from jail, the police served him with the aggravated burglary warrant that led to his present conviction.

The Petitioner said that his trial counsel ("Counsel") did not inform him about any fingerprint evidence and that he learned about this evidence on the first day of his trial. The Petitioner testified that he asked Counsel why Counsel did not inquire about the evidence that the State planned to use at trial, and Counsel did not provide him with an answer. He said that he wanted Counsel to call to testify a fingerprint expert from Loudon County who had looked at the jar earlier. The Petitioner testified that he told Counsel that the Sheriff had asked him to pick up the jar when he was in custody for the stolen motorcycle charge, and Counsel did not discuss this incident during the trial.

The Petitioner testified that Jeff Moses, who testified at his trial, provided alibi testimony on the Petitioner's behalf, but Moses also testified that he had left to go to work. The Petitioner testified that he informed Counsel that Moses's wife, Linda Moses, was with the Petitioner for the entire day; however, Counsel did not call Mrs. Moses as a witness and said that her testimony was unnecessary because Mr. Moses could testify that he saw the Petitioner in the morning and again in the evening.

The Petitioner testified that the trial court failed to charge the jury with the following lesser-included offenses: criminal trespass, attempted burglary, and facilitation of burglary. The Petitioner testified that Counsel did not object to the failure to include those lesser-included offenses.

On cross-examination, the Petitioner acknowledged that five alibi witnesses testified on his behalf but contended that Linda Moses still should have been called as a witness. The Petitioner said that when Counsel asked him about the aggravated burglary charge, he told Counsel that he did not know anything about this charge.

Hester Forester, the Petitioner's mother, and Nancy Freeman, the Petitioner's sister, testified that they picked up the Petitioner from jail. Forester said that when the Petitioner called her from jail he told her that he had been charged with stealing a motorcycle and that, when she bailed the Petitioner out of jail, someone else told her that the Petitioner was charged with aggravated burglary. On cross-examination, Freeman recalled that the Petitioner's lawyer said that the State had fingerprints but that the fingerprints had no use. Freeman said that the Petitioner had a difficult time

talking to his lawyer and did not know what to say. She denied encouraging the Petitioner to tell his lawyer anything that he knew or anything that could help him, but did tell him that he needed to talk to his lawyer. Freeman testified that, after the first trial, she did not accompany the Petitioner to speak with Counsel in preparation for the second trial and did not tell the Petitioner that he needed to talk to Counsel in preparation for the second trial.

Steven Ward testified that he and his law partner, Matthews, represented the Petitioner at the Petitioner's first trial that ended in a hung jury. He said that he met with Detective Hope before the trial, and he learned that Detective Muldenower had looked at the jar and had told Detective Hope that he could not retrieve any fingerprints from the jar. He testified that events in Detective Muldenower's life may have negatively affected the detective's judgment about the lack of identifiable fingerprints on the jar and that he did not call Detective Muldenower to testify because Muldenower's testimony might reveal evidence prejudicial to the Petitioner's case. Ward described how he and Matthews got information about Detective Muldenower's inability to identify fingerprints on the jar into evidence through the cross-examination of Detective Hope. Ward stated that to the best of his knowledge, Monica Watts testified at the Petitioner's first trial about the fingerprints on the jar and Matthews cross-examined her. He testified that Matthews and Counsel spoke frequently after the Petitioner's first trial.

On cross-examination, Ward acknowledged that a transcript of the first trial would have been helpful and said that he did not know whether anyone requested a transcript of the first trial. He said that, during the Petitioner's first trial, Detective Hope indicated that Detective Muldenower glanced at the jar and told him that he was unable to get any usable prints from the jar. He testified that he did not know the nature of Detective Muldenower's personal problems and that he and Matthews never gave Detective Muldenower an opportunity to look at the jar again. He did not recall speaking with the Petitioner about the jar, and he did not know if Matthews discussed the jar with the Petitioner. He did not recall whether the defense called Jeff Moses to testify at the Petitioner's first trial.

Counsel testified that he represented the Petitioner at his second trial and that he met with the Petitioner and with several alibi witnesses on several different occasions. He explained that, at the Petitioner's trial, a woman testified that she had coins in a jar and that someone took the coins away and left the jar behind. He recalled that the Petitioner told him that he had handled this jar, but the Petitioner first told him this after the Petitioner was convicted. Counsel said that he contacted Matthews, the Petitioner's previous counsel, as soon as the Petitioner told him about the jar, and Matthews testified as a witness in the Petitioner's motion for new trial. Counsel also recalled speaking with the Petitioner's first attorney, Ward, about the Petitioner's case. He said that he did not receive any information about Detective Muldenower from the Petitioner or from the discovery from the State. The only information that he had regarding Detective Muldenower came from the trial transcript from the Petitioner's first trial. He considered having Detective Muldenower testify, but he also thought that Detective Muldenower could provide testimony that was detrimental to the Petitioner. Counsel testified that he did not call Linda Moses because she said she needed to stay with a sick family member. Further, her husband had written a check that was entered into evidence,

and everyone agreed that the check provided the best evidence. Counsel testified that he would have insisted that Linda Moses come to testify if the Petitioner had so insisted.

On cross-examination, Counsel testified that he interviewed State witnesses but that he did not make written recordings to document those interviews and did not recall the Petitioner asking him to record these interviews. Counsel said that he told the Petitioner about the expected testimony from State witnesses and gave the Petitioner a copy of the discovery. Counsel spoke with Detective Muldenower but could not recall if he spoke with the detective before the trial. He said that he did not ask Detective Muldenower to look at the State's evidence regarding the fingerprint and that he did not ask the detective to appear as a witness at the Petitioner's trial. Counsel did not consider getting an independent expert to review the fingerprint testimony. He acknowledged that the transcript from the first trial indicated that Detective Hope would impeach Detective Muldenower's assessment of the fingerprints. Counsel testified that he asked the trial court for a continuance at trial so that he could ask Detective Muldenower to testify but that he did not know why he wanted Detective Muldenower to testify at trial. He acknowledged that he could have supoenaed Detective Muldenower when he read the transcript of the first trial. He did not recall asking the Petitioner how the Petitioner's fingerprint could have gotten on the jar if the Petitioner did not commit the burglary.

Counsel did not recall the Petitioner asking him about the lesser-included offense of criminal trespass. He testified that the Petitioner's father provided the most damaging testimony to the Petitioner's alibi defense when his father testified that he knew that the Petitioner was not involved in the burglary because the crime occurred on the first day of a hunting season. Noting that he had tried the case three years ago, Counsel said that there were reasons that Linda Moses did not testify, but he could not recall the exact reasons, except the fact that Linda Moses had a sick relative. He said that he discussed the alibi defense with the Petitioner and that they decided to have Jeff Moses testify and introduce into evidence the check that he wrote.

Based upon this evidence, the post-conviction court determined that the Petitioner had not proven that Counsel was ineffective and dismissed the petition. It is from that judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial. Specifically, the Petitioner claims that Counsel was ineffective by: (1) failing to call Detective Muldenower and Linda Moses as witnesses; and (2) failing to request a jury instruction on the lesser-included offense of criminal trespass.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions

concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [Petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [Petitioner] by the Sixth Amendment. Second, the [Petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [Petitioner] of a fair trial, a trial whose result is reliable. Unless a [Petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)). In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland, 466 U.S. at 688 (1984)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6

S.W.3d at 462. Finally, we note that a Petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, n.38 (1984)).

Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation." House, 44 S.W.3d at 515 (citation omitted); Thomas Brandon Booker v. State, No. W2003- 00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. Jun. 21, 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

### A. Failure to Call Detective Muldenower and Linda Moses

The Petitioner's first assertion is that Counsel was ineffective by failing to call Detective Muldenower of the Loudon County Sheriff's Department as a witness to testify that he examined a jar in the Petitioner's case and found no usable fingerprints. The Petitioner further asserts that Linda Moses was an "essential alibi witness." The post-conviction court concluded that post-conviction relief cannot be based on the speculative testimony of Detective Muldenower or Linda Moses.

First, we note that in order for a petitioner to establish prejudice from his attorney's failure to call a witness, the petitioner must have this witness testify at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In Black, this Court established that:

> It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts

or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called.

Id.

In the case under submission, the evidence does not preponderate against the findings of the post-conviction court. The Petitioner failed to provide any evidence regarding what the testimony from Detective Muldenower or any other fingerprint expert would have entailed. Ward testified that he chose not to have Detective Muldenower testify at the Petitioner's first trial because such testimony may have harmed the defense. Similarly, the Petitioner failed to provide sufficient evidence to show that Linda Moses's testimony would have benefitted his case. At the post-conviction hearing, Petitioner's counsel testified that he supoenaed Linda Moses but that she did not come to the post-conviction hearing. However, the Petitioner provided no affidavits or other proof regarding her testimony. Furthermore, the record reflects that five alibi witnesses testified at the Petitioner's trial. Therefore, there is insufficient evidence showing that the absence of Linda Moses's testimony or Muldenower's testimony was prejudicial to the Petitioner's case. We note that if prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697. Therefore, the Petitioner is not entitled to relief on this issue.

## B. Failure to Request Jury Instruction on Criminal Trespass

Next, the Petitioner argues that Counsel was ineffective for failing to object to the jury instructions given at trial or to request that the trial court charge criminal trespass as a lesser-included offense of aggravated burglary. The post-conviction court found:

[S]ince Petitioner was found guilty of the charge of burglary and since the lesser-included offense of misdemeanor aggravated criminal trespass was charged, any failure by the court to charge simple criminal trespass was, if error at all, harmless error, and harmless error cannot provide grounds for post[-]conviction relief.

The evidence does not preponderate against the findings of the post-conviction court. Even if counsel were ineffective in this area, the Petitioner has failed to show that he was prejudiced by Counsel's performance. The trial court charged the lesser-included offenses of attempt to commit aggravated burglary, a Class D Felony, and aggravated criminal trespass in a habitation, a Class A misdemeanor, and the jury convicted the Petitioner of the higher offense of aggravated burglary. The jury's verdict of the greater offense and its disinclination to consider the other lesser-included offenses clearly demonstrated that the jury would not have returned a verdict of criminal trespass, a Class C misdemeanor. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998)

### III. Conclusion

In accordance with the foregoing, we conclude that the post-conviction court committed no reversible error.  Therefore, the judgment of the post-conviction court is affirmed.

_____

ROBERT W. WEDEMEYER, JUDGE